# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WENDY S., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ANDREW M. SAUL, Commissioner ) <br> of Social Security,[1] ) <br> ) <br> Defendant. ) | No. 18 C 1753 <br><br> Magistrate Judge Gabriel A. Fuentes |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Wendy S.,[3] moves for reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB"). (D.E. 14.) The Commissioner has filed a response brief, asking this

---

[1]The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2]On April 26, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 11.) On May 31, 2019, this case was reassigned to this Court for all proceedings. (D.E. 31.)

[3]The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name, thereby suppressing her last name, in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield Unites of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing. Put to such a showing here, a party may well be able to demonstrate that suppressing the surname of the plaintiff inflicts little or no prejudice upon the government defendant, but establishing that the circumstances favoring privacy are so exceptional as to outweigh the public policy in favor of identified parties would be more challenging. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated. The Court's understanding is that the claimants' names in all of these matters brought for judicial review under the Social Security Act are otherwise available upon a review of the public docket.

Court to affirm the Commissioner's decision. (D.E. 22.) The matter is now fully briefed. For the following reasons, the Court grants Plaintiff's motion and remands the case.

## I. Procedural History

Plaintiff applied for DIB on August 20, 2014, alleging she has been unable to work due to mental impairments since the alleged onset date of her disability on May 14, 2011, which was later amended to October 16, 2012. (R. 38.) Her date last insured ("DLI") was June 30, 2013.[4] (R. 17.) After her claim was denied initially and on reconsideration, Plaintiff received a hearing on January 17, 2017 before an Administrative Law Judge ("ALJ"). (R. 33.) On March 13, 2017, the ALJ issued a decision denying Plaintiff's claim. (R. 28.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's ruling the final decision of the Commissioner. (R. 1.) *See Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017).

## II. Evidentiary Record

Plaintiff was born on December 6, 1971. (R. 26.) She was first treated for major depressive disorder in 2005, three weeks after giving birth to her daughter, and she was prescribed an anti-depressant. (R. 464.) In 2007, after her grandfather died, Plaintiff was hospitalized after exhibiting psychotic symptoms, and her mood stabilized with medication. (R. 464.) Plaintiff lives in her parents' home with her daughter. She last worked in 2011, earning $3,625.51 working part time at Target as a stock clerk. (R. 275.) In 2009 and 2010, Plaintiff earned between $7,000.00 and $8,000.00 doing the same work. (*Id.*)

---

[4]To be eligible for DIB, the claimant must show that she was disabled by her date last insured. *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012).

2

## A. Medical Record

In 2010, Plaintiff received treatment from psychiatrist Alicia Martin, M.D., for bipolar disorder type II.[5] (R. 458.) Dr. Martin prescribed her Zoloft and Seroquel, and throughout 2010, Plaintiff's mood was stable with medication.[6] (R. 455-60.) On February 7, 2011, Plaintiff presented to Dr. Martin feeling depressed and irritable over her daughter's oppositional and disobedient behavior; Dr. Martin increased Plaintiff's dose of Seroquel to 200 mg and recommended that she receive counseling (R. 461-62.) In March 2011, Plaintiff was still having problems with depression and mood swings, but she was feeling better with the increased dose of Seroquel. (R. 464.) Dr. Martin noted that Plaintiff was unable to work full-time due to her continued problems with episodic mood instability. (R. 465.) In April and May 2011, Plaintiff did not report mood swings or depression, but she was still worried about her daughter's behavior. (R. 467-68.)

On July 29, 2011, Plaintiff reported to Dr. Martin that she had quit her job at Target because she felt anxious and nauseated every time she went to work, and her supervisor indicated to her that she was slow and unable to keep up with her job. (R. 469.) Plaintiff reported that she felt much better since leaving her job. (*Id.*) In July, August and October 2011, Dr. Martin's mental examinations of Plaintiff were normal. (R. 470-71.)

---

[5]Bipolar disorder "is a mental health condition that causes extreme mood swings that include emotional highs (mania or hypomania) and lows (depression)." https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/symptoms-causes/syc-20355955 (last visited July 1, 2019). Bipolar II disorder means an individual has had at least one major depressive episode and at least one hypomanic episode, but no manic episode. *Id.*

[6]Zoloft belongs to a group of medicines known as selective serotonin reuptake inhibitors (SSRIs). It is used to treat depression, and other mental health disorders. https://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940 (last visited July 1, 2019). Seroquel is used alone or together with other medicines to treat bipolar disorder (depressive and manic episodes), schizophrenia and major depressive disorder. https://www.mayoclinic.org/drugs-supplements/quetiapine-oral-route/description/drg-20066912 (last visited July 1, 2019).

3

On December 20, 2011, Plaintiff reported to Dr. Martin that she became nervous and nauseated when she tried to apply for jobs. (R. 472.) She was also having periods of sadness and depression, so Dr. Martin increased her daily dose of Zoloft to 150 mg. (*Id.*) Dr. Martin noted that she had encouraged Plaintiff "to combine treatment with counseling for quite some time, but she gave reasons or excuses for not being able to see the therapist." (*Id.*) In January 2012, Plaintiff "insist[ed] that she is unable to work due to problems with anxiety at times so severe that she feels nauseated and vomits when she has these symptoms." (R. 474.)

In April 2012, Plaintiff reported to Dr. Martin that she was having mood swings, irritability and mild racing thoughts at night. (R. 476.) Dr. Martin increased her dose of Seroquel to 250 mg. (*Id.*). The next month, although Plaintiff still got "very upset" sometimes, Dr. Martin moved the dose back to 200 mg because Plaintiff did not like the effects of a higher dose. (R. 480.)

In May 2012, Plaintiff began receiving therapy from Rob Luck, LCSW, LPHA, MSW. (R. 478.) During their May and June sessions, Plaintiff reported that she preferred to stay inside her house. (R. 478, 481.) She was having problems with anger toward her family members, and she was tearful and sad due to the recent passing of family members. (R. 483.) Dr. Martin's mental examinations of Plaintiff remained normal; Dr. Martin noted that Plaintiff sometimes felt sad, especially on the anniversary of a loved one's death, but she did not experience symptoms of major depression or psychosis. (R. 485-86, 551.)

In November 2012, Mr. Luck noted that Plaintiff was more depressed, tearful and focused on death. (R. 488.) Plaintiff told Dr. Martin that there were significant stressors in her life, including ailing family members and concerns about child support, but Plaintiff continued to do well with her medications, and Dr. Martin did not observe any signs of depression or hypomania. (R. 490-92.) On April 25, 2013, Dr. Martin completed a psychiatric reassessment of Plaintiff. (R.

4

493.) Dr. Martin opined that "[e]ven though the patient's symptoms are ameliorated with the current doses of Seroquel and Zoloft, her symptoms limit her social involvement and the symptoms of her mental illness affects her ability to function at her normal level, causing her some relationship problems at work and poor performance." (R. 494.)

In June 2013, Plaintiff's insurance stopped covering the extended release Seroquel she had been taking, so Dr. Martin prescribed the same dose (200 mg) of Seroquel immediate release. (R. 495.) With the new medication, Plaintiff experienced a recurrence of "very disturbing" auditory hallucinations, where she heard someone calling her name. (R. 497.) Dr. Martin increased the dose of Seroquel to 300 mg and noted that although Plaintiff could complete her activities of daily living ("ADLs"), she was "unable to work, as the symptoms of her mental illness affect social involvement and also ability to function." (*Id.*)

By September 2013, Plaintiff was no longer experiencing auditory hallucinations, and her mood was stable. (R. 501.) She began meeting with a new therapist, David Hughes, LCSW, LPHA, MSW. (R. 499.) In September and October 2013, Plaintiff told Mr. Hughes that she was stressed and frustrated with trying to raise her daughter in her parents' household, and she had frequent conflicts with her parents about raising her daughter. (R. 503-05.) In November 2013, Plaintiff reported to Dr. Martin that she was having problems with irritability during the day. (R. 507.) In addition to Seroquel 300 mg at bedtime, Dr. Martin added a small dose of Seroquel, 50 mg, to be taken during the day. (*Id.*)

On February 5, 2014, Dr. Martin increased Plaintiff's dose of Zoloft to 200 mg to help alleviate her increased depressive symptoms, including sadness, low energy and lack of motivation. (R. 516.) The following month, Plaintiff told Mr. Hughes that she was experiencing periods of increased anxiety that led her to withdraw into her room. (R. 519.) On March 3, 2014,

Mr. Hughes wrote a letter opining that medication reduces but does not eliminate Plaintiff's symptoms of isolation, angry outbursts, anxiety and agoraphobia, which sometimes caused her to become physically sick in crowds of people. (R. 441.)

On April 9, 2014, Plaintiff's father attended her meeting with Dr. Martin. (R. 520.) Plaintiff and her father accused Dr. Martin of reporting that Plaintiff was able to work, and thus causing Plaintiff to be denied Social Security benefits. (*Id.*) Dr. Martin stated that to the contrary, she had opined Plaintiff was unable to work because her symptoms of mental illness affect her level of functioning. (*Id.*) Dr. Martin noted that Plaintiff's mood was unstable; although she was initially calm, she easily became very angry and stormed out of the office when Dr. Martin asked her not to yell. (*Id.*) Later that month, Plaintiff told Mr. Hughes that she was experiencing increased anxiety as well as manic episodes during which she experienced increased energy and cleaned her house non-stop. (R. 522.)

In May 2014, Plaintiff's father submitted a "function report" stating that Plaintiff had a "very hard time interacting with people" and preferred not to interact outside the home. (R. 302, 307.) In addition, he wrote that Plaintiff got lost easily, had a very short temper and did not deal well with pressure. (*Id.*) He explained that he and his wife help care for Plaintiff's daughter; Plaintiff takes her daughter to school but then goes back to bed. (R. 303, 307.) Also that month, a non-examining state agency psychologist, Donald Henson, Ph.D., reviewed the record and opined that Plaintiff had severe affective disorders which caused moderate limitations in her ADLs, social functioning, and concentration, persistence or pace, including in her ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, complete a normal workday and workweek without interruption from psychologically based symptoms, perform at a

consistent pace without an unreasonable number and length of rest periods and interact appropriately with the general public. (R. 122-25.)

In June 2014, Plaintiff began seeing psychiatrist Syed Anwar, M.D. He initially continued her on the same medications -- 200 mg of Zoloft and 50 mg plus 300 mg of Seroquel -- but in August 2014, Plaintiff reported increased daytime anxiety, and Dr. Anwar increased her morning dose of Seroquel to 100 mg. (R. 587-88.) In October 2014, Dr. Anwar noted that Plaintiff appeared anxious and had a lot of mood instability. (R. 589.) Plaintiff reported that the medication makes her very sleepy, and she recently got in trouble with the police. (*Id.*) Dr. Anwar had Plaintiff go back to Seroquel 50 mg in morning and added a prescription for Lamictal.[7] (R. 590.) In November 2014, Plaintiff told Dr. Anwar the medication was helping, but she was worried about the anniversaries of deaths coming up, and Dr. Anwar increased her dose of Lamictal. (R. 591.)

At the end of 2014 and throughout 2015, Dr. Anwar continued to manage Plaintiff's medications, and Plaintiff participated in individual and group counseling with Catherine Tiberi, MA, LCPC. In February 2015, Plaintiff described feeling wired up and anxious with a lot of mood swings, and Dr. Anwar increased her morning dosage of Seroquel to 100 mg. (R. 592-93.) Ms. Tiberi noted in a letter that she had witnessed Plaintiff "being easily agitated, not thinking actions through for potential repercussions, difficulty regulating moods, experiencing manic symptoms of inflated self-esteem and self-reported increase in cleaning habits in the home environment." (R. 524.) Ms. Tiberi opined that Plaintiff would have trouble maintaining gainful employment because she was easily overwhelmed, overslept and missed appointments, needed assistance from staff to calm herself down, and had difficulty interacting with family members. (R. 525.) Throughout

---

[7]Lamictal is an anti-seizure medication which can also be used in the treatment of bipolar disorder in adults. https://www.mayoclinic.org/drugs-supplements/lamotrigine-oral-route/description/drg-20067449 (last visited July 1, 2019).

7

2015, Plaintiff at times did not do her group therapy homework, forgot her work at home, or arrived late; she had good days and bad days, sometimes participating in group and at other times getting angry and frustrated with the staff and the group. (R. 610, 614-15, 619-20, 625, 630, 635, 664, 670-71.) On December 1, 2015, Ms. Tiberi noted that Plaintiff was upset that another parent was chosen to help lead her daughter's Girl Scout troop, and she was not considered. (R. 676.)

In May 2015, a non-examining state agency psychologist, David L. Biscardi, Ph.D., reviewed the record. He agreed with Dr. Henson's opinion from May 2014, but added moderate limitations in accepting instructions and responding appropriately to criticism from supervisors, interacting with co-workers or peers without distraction, and responding appropriately to changes in the work setting. (R. 136.) Dr. Biscardi opined that Plaintiff could carry out simple one to three step tasks, interact briefly and superficially with co-workers and supervisors, and adapt to changes in the workplace associated with simple work activities. (*Id.*)

### B. Evidentiary Hearing

On January 17, 2017, the ALJ held a hearing in this case. Plaintiff testified about her alleged impairments and her experiences working part-time at Target. She stated that she used to show up one to two hours late because it was very stressful for her to go to work, and she would throw up before even arriving at work. (R. 51.) She was often absent three to four days a month. (R. 51-52.)

Mark I. Oberlander, Ph.D., an independent medical expert who had reviewed the record, also testified. He first considered the time period from the alleged onset date of October 16, 2012 through November 24, 2014. (R. 44.) Dr. Oberlander opined that during that time, Plaintiff did not have any evidence of the presence of Paragraph C criteria, and she had moderate impairment in each of the Paragraph B criteria: capacity for understanding, remembering and applying

8

information; capacity for appropriate interaction with others; capacity for concentration, persistence or pace; and capacity for adaptation and management of one's self.[8] (*Id.*). After November 24, 2014, Dr. Oberlander opined that the C criteria were demonstrated because there was evidence of significant fluctuation in symptom severity that could lead to further decompensation if Plaintiff discontinued her psychotropic medications or her individual or group therapy. (R. 44-45.)

Prior to November 2014, Dr. Oberlander found evidence that Plaintiff had a "good response to medication management," and she was able to work part-time. (R. 46.) Dr. Oberlander opined that Plaintiff could: perform "simple, routine, repetitive work activities" with "[o]ne, two, three step work instructions;" "react appropriately to reasonable changes in work assignment;" and "tolerate the proximity of others" but "only interact with others on an occasional, non-intimate basis." (R. 47.) Although he acknowledged that the moderate limitations in the Paragraph B criteria would have "some impact" on Plaintiff's ability to be on task or present at work, Dr. Oberlander testified they "would not impair capacity" for all work activity. (R. 47-48.) He did not opine on how many workdays Plaintiff would miss based on her limitations. (*Id.*)

The ALJ asked the vocational expert ("VE") to consider a hypothetical individual who was limited to: no fast-paced assembly line type work or hourly production quotas; simple, routine,

---

[8]"Paragraph B" provides the functional criteria for determining whether an individual is disabled under the listings for mental disorders. *See* Listing 12.00A(2). The "listings" in the social security regulations specify the criteria for those impairments considered presumptively disabling. *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1150 (7th Cir. 2019) (citing 20 C.F.R. § 404.1525(a)). To satisfy the Paragraph B criteria (and thus demonstrate an individual is disabled), a mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. "Paragraph C" provides the criteria for evaluating "serious and persistent mental disorders," an alternative to the Paragraph B criteria for proving disability. Listing 12.00G. To satisfy the paragraph C criteria, a mental disorder must be "serious and persistent"; that is, there must be a medically documented history of the existence of the disorder over a period of at least two years, and evidence that shows that the individual relies, on an ongoing basis, upon medical treatment and/or mental health therapy to diminish the symptoms and signs of the mental disorder, but that despite the diminished symptoms and signs, the individual has achieved only marginal adjustment, meaning she has minimal capacity to adapt to changes in her environment. *Id.*

repetitive type work; occasional interaction with others; and no tandem tasks. (R. 61-62.) The VE testified that Plaintiff could not perform her past work but that other work was available in the national economy. (R. 63-64.) However, there was no work available for an individual who was "absent 10 percent of the time, or more, or two or more days a month regularly." (R. 65.)

### C. ALJ's Decision

On March 13, 2017, the ALJ issued an opinion finding that Plaintiff was not disabled within the meaning of the Social Security Act from her alleged onset date of October 16, 2012, through her DLI of June 30, 2013. (R. 15.) In accordance with Social Security regulations, the ALJ followed the five-step sequential evaluation process to determine if Plaintiff was disabled. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v). At step one, the ALJ found that Plaintiff was not engaged in substantial gainful activity. (R. 17.) At step two, the ALJ concluded that Plaintiff had three severe impairments: affective disorder, anxiety disorder and personality disorder. (*Id.*) At step three, the ALJ determined that none of these impairments, alone or in combination, established that Plaintiff was disabled under the listings (R. 18), and therefore, the ALJ reviewed the record and determined that Plaintiff had the residual functional capacity ("RFC") to perform work with certain non-exertional limitations. (R. 23.) Finally, at step four, the ALJ concluded that Plaintiff could not perform her past relevant work given her RFC, but that at step five, she was capable of performing certain jobs that existed in significant numbers in the national economy. (R. 26-28.)

In determining whether Plaintiff's impairments met a listing, the ALJ agreed with Dr. Oberlander that Plaintiff had only moderate limitations in the four areas of mental functioning in the Paragraph B criteria, and that no evidence established the presence of the paragraph C criteria. (R. 23.) The ALJ recognized the following evidence of functional limitations: Plaintiff's reports that she preferred to stay home where she felt safe, her father's report that she will not interact

10

with people, Plaintiff's testimony that she quit her job because criticism of her work performance caused her increased anxiety, her arrest for resisting arrest after she pushed a police officer, and her recurrent difficulty monitoring her response to the anniversary of the deaths of her relatives. However, the ALJ concluded that Plaintiff was only moderately limited in the areas of mental functioning because, among other things: she was never documented exhibiting memory problems; she had been able to go through a job interview, be hired, and go through training "without experiencing increased anxiety;" she "successfully" participated in group therapy and in her daughter's Girl Scout troop; she had no trouble participating in the administrative hearing,[9] and there was no evidence that Plaintiff became "so overwhelmed that she was unable to function."[10] (R. 21-22.)

Next, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, but "limited to work that requires performance of simple routine tasks" that do not require fast-paced line work, a machine-set pace, or hourly production quotas. (R. 23.) Further, Plaintiff could have "occasional contact with the public, co-workers, and supervisors," but she was precluded from work that requires performance of "tandem tasks." (*Id.*) In support of this determination, the ALJ explained that she found that despite Plaintiff's problems with increased anxiety in public places and difficulty adapting to stressful family situations, Plaintiff's symptoms "were controlled generally" with medication and her mental examinations were normal. (R. 18-21, 24-25.) The ALJ also considered Plaintiff's stated reasons for leaving her part-time job at

---

[9]Contrary to Plaintiff's argument (Pl.'s Br. at 14), the ALJ is permitted to make credibility determinations based on his or her personal observations of the claimant. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying.")

[10]Although the parties do not raise this issue, we note that the standard for determining disability does not require a claimant to be "unable to function." Rather, the ALJ considers whether the claimant is unable to work a full-time job.

Target and concluded "there was no indication that she had had problems interacting with co-workers or customers, or even supervisors when they were not reviewing her job performance." (R. 25.) In addition, the ALJ determined that Plaintiff's participation in group therapy showed "she was able to travel to where a group of people met and interact[] with them by discussing and working through her problems, as well as the problems of other people." (R. 24-25.)

The ALJ gave Mr. Hughes' March 2014 letter "no weight" because it did not provide a "specific function-by-function description of how the claimant was limited by the symptoms of her mental impairments." (R. 26.) The ALJ also gave "no weight" to Ms. Tiberi's letter because it referred to Plaintiff's functioning 14 months after the DLI. (*Id.*) By contrast, the ALJ gave Dr. Oberlander's testimony "great weight" because he was a specialist in Social Security and had reviewed the complete record. (R. 25.) In addition, the ALJ gave "some weight" to the non-examining state agency consultant opinions "to the extent . . . [they] recognized the claimant was functionally limited by her mental impairments." (*Id.*)

In the end, the ALJ agreed with the VE that Plaintiff could not perform her past relevant work because those jobs were semi-skilled, and thus involved more than simple, routine tasks. (R. 26.) However, the ALJ determined that through the DLI, there were a significant number of jobs in the national economy that Plaintiff could have performed. (R. 27.)

### III. Standard of Review

Courts review ALJ decisions deferentially to determine if they are supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (internal citations and quotations omitted). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the

ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

## IV. Analysis

Plaintiff makes several arguments for why the ALJ's decision should be reversed and remanded.[11] We find two of these arguments persuasive: that the ALJ failed to properly evaluate Plaintiff's history of tardiness and absenteeism at work, and that the ALJ misapplied the evidence post-dating the DLI. (Pl.'s Br. at 8-10; D.E. 27, Pl.'s Reply at 9.)

### A. Plaintiff's Work History

Plaintiff argues that the ALJ failed to properly evaluate her history of tardiness and absenteeism when she worked part-time at Target and that this error requires remand because the VE testified that Plaintiff would not be able to work if she was absent more than 10 percent of the time. (Pl.'s Br. at 8-9.) The Seventh Circuit has "cautioned ALJs not to draw conclusions about a claimant's ability to work full time based on part-time employment," *Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017), as "[t]here is a significant difference between being able to work a few hours a week and having the capacity to work full time." *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010).

---

[11] We briefly address Plaintiff's argument that the ALJ's "boilerplate" credibility language – finding Plaintifff's testimony "not entirely consistent" with other evidence in the record – increased Plaintiff's burden beyond the preponderance of the evidence standard. (Pl.'s Br. at 12.) The Seventh Circuit has repeatedly upheld ALJ decisions using similar boilerplate language where the ALJs gave specific reasons, supported by evidence in the record, for their credibility findings. The Court declines to find additional or alternative meanings to this language where the Seventh Circuit has not. *See, e.g., Cooley v. Berryhill*, 738 F. App'x 877, 880 (7th Cir. 2018) (affirming ALJ's credibility finding that the claimant's allegations were "not entirely consistent" with the record where the ALJ cited to specific reasons in the record); and *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (same, with regard to the phrase "not entirely credible").

13

Here, the ALJ found that "despite the claimant's report of anxiety in social situations, she had been able to go through a job interview, be hired, and go through training without experiencing increased anxiety." (R. 22.) The ALJ considered Plaintiff's stated reasons for leaving her part-time job at Target and concluded "there was no indication that she had had problems interacting with co-workers or customers, or even supervisors when they were not reviewing her job performance." (R. 25.) The ALJ's reasoning here is not supported by substantial evidence.

Plaintiff's testimony and her doctors' reports directly contradict the ALJ's assertions that Plaintiff was able to interview and go through training "without experiencing anxiety" or that "there was no indication" that she had problems interacting with others at work. Dr. Martin opined multiple times that despite taking Seroquel and Zoloft, Plaintiff's symptoms of mental illness led to relationship problems and poor performance at work. In addition, Plaintiff testified that she suffered so much anxiety and nausea working at Target that she had to quit.

"A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job." *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). In *Lanigan*, the Seventh Circuit reversed and remanded the decision of an ALJ who concluded that there was no evidence that the claimant's self-described "severe problems being in public" prevented him from working because he had worked in a retail store 15 to 22 hours a week and had sustained other work requiring some social interaction. *Lanigan*, 865 F.3d at 564-65. In this case, Plaintiff could not handle the stress even of a part-time job. Thus, we find that the ALJ failed to properly evaluate Plaintiff's work history, and this error requires remand.

## B. Post-DLI Evidence

In addition, Plaintiff contends that the ALJ did not properly consider evidence post-dating her DLI. On the one hand, Plaintiff contends that the ALJ failed to address adequately Dr. Oberlander's determination that she was disabled as of November 24, 2014, because the evidence supporting that finding was consistent with the evidence preceding her DLI. (Pl.'s Br. at 10; Pl's Reply at 9.) On the other hand, Plaintiff contends that the ALJ should not have relied on her ability to attend group therapy in 2015 as evidence that she could perform full-time work before her DLI. (Pl.'s Br. at 13.)

"An ALJ must consider all relevant evidence, even evidence that postdates the date last insured." *Hansen v. Berryhill*, No. 17 C 3131, 2018 WL 3458281, at *3 (N.D. Ill. July 18, 2018) (Rowland, J.). "Post-DLI evidence may shed light on a claimant's condition before the DLI, and it may also help corroborate a claimant's subjective complaints." *Catherine P. v. Berryhill*, No. 17 C 50287, 2019 WL 1057313, at *6 (N.D. Ill. Mar. 6, 2019) (Johnston, J.). *See also Wilson-Boddy v. Berryhill*, No. 17 C 8605, 2018 WL 4005209, at *2 (N.D. Ill. Aug. 22, 2018) (Weisman, J.) (holding that the ALJ should have considered post-DLI evidence that corroborated pre-DLI evidence).

In this case, Dr. Oberlander testified that Plaintiff's impairments were disabling after November 24, 2014, because Plaintiff was "being maintained on three psychotropic medications" as well as individual and group therapy, and there was evidence of "some significant fluctuation in symptom severity" in the reports of both psychiatric providers, Dr. Martin and Dr. Anwar (R. 45.) In support of his opinion, Dr. Oberlander cited to "exhibit B-8F," which consists of 85 pages of progress notes from both Dr. Anwar and Dr. Martin, extending from February 2011 to April 2015. (*Id.*) The ALJ stated that Dr. Oberlander's testimony that Plaintiff was not disabled was

persuasive and entitled to great weight because it was formed after review of the complete record, and he "relied on references to the record to provide support for his opinion." (R. 25.) The ALJ did not address Dr. Oberlander's determination that Plaintiff was disabled as of November 24, 2014. This is problematic because Dr. Oberlander's citation to the record includes evidence from both before and after the DLI that is not obviously inconsistent with each other. The ALJ's failure to address what, if any, changes occurred in Plaintiff's impairments to make them not disabling before June 2013 and disabling after November 2014 was error.

Although the ALJ did not address Dr. Oberlander's post-DLI opinion, the ALJ relied on Plaintiff's ability to participate in group therapy and in her daughter's Girl Scout troop post-DLI (in late 2014 and 2015) to find Plaintiff not disabled before her DLI. (R. 22.) The ALJ concluded that Plaintiff's participation in group therapy showed she was able to meet and interact with a group of people and work through problems with them. (R. 24-25.)

The ALJ's reliance on Plaintiff's participation in group therapy and the Girl Scouts to find Plaintiff was not disabled before the DLI was erroneous for several reasons. First, as Plaintiff points out, the evidence showed that Plaintiff frequently had trouble interacting with the group, and the ALJ improperly ignored this evidence. (Pl.'s Br. at 10.) *See Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018) ("ALJs are not permitted to cherry-pick evidence from the record to support their conclusions, without engaging with the evidence that weighs against their findings.") Second, the ALJ erred by failing to explain how Plaintiff's participation in group therapy and the Girls Scouts (and her hurt feelings about not being chosen to help the troop leader) was inconsistent with Plaintiff's description of her symptoms of social anxiety and her inability to work even part-time because of them. *See Cullinan v. Berryhill*, 878 F.3d 598, 603-04 (7th Cir. 2017) (holding that although a claimant's daily activities may be used to discredit a claimant's testimony, they

may not be equated with the ability to perform a full-time job). "Nor is any inconsistency obvious." *Id.* at 603. Third, the ALJ's reasoning is incongruous. The ALJ determined that Plaintiff was not disabled based on evidence that she was able to participate in group therapy months after her DLI, when Dr. Oberlander opined she *was* disabled at that point. This inconsistent reasoning does not permit the Court to conclude that substantial evidence supports the ALJ's finding that Plaintiff was not disabled.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment (D.E. 14) is granted. We remand the case for further proceedings consistent with this opinion.[12] The case is terminated.[13]

ENTER:

GABRIEL A. FUENTES
United States Magistrate Judge

**DATED: July 2, 2019**

---

[12] On remand, the Court suggests the ALJ also review the opinions of Plaintiff's treating psychiatrists and therapists on her mental health limitations and her ability to work. As a reminder, for claims filed before March 27, 2017, "a judge should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record." *Kaminski v. Berryhill*, 894 F.3d 870, 874 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2)). The ALJ must evaluate a treating physician's noncontrolling opinion by considering the regulatory factors listed in 20 C.F.R. § 404.1527(c), *Lambert v. Berryhill*, 896 F.3d 768, 775 (7th Cir. 2018), and offer "a good reason" for disregarding the opinion of a treating physician. *Walker v. Berryhill*, 900 F.3d 479, 485 (7th Cir. 2018). In addition, "ALJs must consider medical opinions about a patient's ability to work full time because they are relevant to the RFC determination." *Lambert*, 896 F.3d at 776.

[13] The Court rejects Plaintiff's argument that the Court should award benefits rather than remand the case to the Commissioner. (Pl.'s Br. at 13-14.) While this is permissible, it is not "normally" done. *Mueller v. Astrue*, 493 Fed. App'x 772, 777 (7th Cir. 2012). Although there are errors in the ALJ's treatment of some of the evidence, an immediate award of benefits is not appropriate in this case. Rather, Plaintiff "is entitled to have all the evidence fairly weighed" on remand. *Id.*